United States District Court
Middle District of Florida
Jacksonville Division

**DEBRA PALOPOLI,**

*Plaintiff,*

v.

**No. 3:25-CV-1063-PDB**

**COMMISSIONER OF SOCIAL SECURITY,**

*Defendant.*

---

# Order

Proceeding under 42 U.S.C. § 405(g), the plaintiff requests judicial review of a final decision by the Commissioner of Social Security. Doc. 1. The plaintiff argues that the Administrative Law Judge (ALJ) erred by failing to account for the total limiting effects of her vision impairments. Doc. 10 at 1. The procedural history, evidence, and law are summarized in the decision, Tr. 10–24, and the briefs, Docs. 10, 16, 17, and not fully repeated here. The pertinent period is July 18, 2019, to March 31, 2024. Tr. 24.

**1.**

Section 405(g) governs the court's authority:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner …, with or without remanding the cause for a rehearing. The findings of the Commissioner … as to any fact, if supported by substantial evidence, shall be conclusive, and where a claim has been denied by the Commissioner … or a decision is rendered under subsection (b) of

this section which is adverse to an individual who was a party to the hearing before the Commissioner …, because of failure of the claimant or such individual to submit proof in conformity with any regulation prescribed …, the court shall review only the question of conformity with such regulations and the validity of such regulations.

42 U.S.C. § 405(g). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoted authority omitted). A court may not decide facts anew, make credibility findings, or reweigh the evidence. *Buckwalter v. Acting Comm'r of Soc. Sec.*, 5 F.4th 1315, 1320 (11th Cir. 2021).

**2.**

In the decision, entered on April 22, 2024, the ALJ found that the plaintiff last met the insured status requirements on March 31, 2024. Tr. 13. The ALJ found that the plaintiff had not engaged in substantial gainful activity during the period beginning on her alleged onset date of July 18, 2019, and ending on March 31, 2024. Tr. 13. The ALJ observed that the plaintiff had earned $24,204.61 in 2019 and $2,630.72 in 2020 from Liberty Mutual Insurance Company but probably earned the amounts before July 18, 2019, through long-term disability payments. Tr. 13. The ALJ noted that the primary care notes conveyed that the plaintiff had been on long-term disability because of retinal changes and a purported difficulty seeing the computer, and further noted that her employer did not support continued long-term disability. Tr. 13.

The ALJ found that the plaintiff had suffered severe impairments of low vision, glaucoma, retinal detachment, and lattice degeneration of the retina during the relevant period. Tr. 13. The ALJ found that the plaintiff had had

2

various non-severe impairments during the relevant period and explained his reasoning. Tr. 13–14.

The ALJ found that the plaintiff had suffered from no impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments during the relevant period. Tr. 16. The ALJ reviewed Listings 1.00 (Musculoskeletal Disorders), 2.00 (Special Senses/Speech), 4.00 (Cardiovascular System), 9.00 (Endocrine Disorders), 11.00 (Neurological Disorders), and 12.00 (Mental Disorders). Tr. 16. The ALJ observed that "no treating or examining physicians have reported findings similar in severity to the description provided for any impairment" in the listings. Tr. 16. Regarding vision, the ALJ made this finding and provided this explanation, "Listing 2.04, Loss of visual efficiency, or visual impairment, in the better eye has not been met, as the evidence does not establish a visual efficiency percentage of 20 or less after best correction or a visual impairment value of 1.00 or greater after best correction[.]" Tr. 16.

The ALJ found that the plaintiff has the residual functional capacity (RFC) to perform the full range of light work except that she can only occasionally climb ladders; frequently climb stairs, stoop, and crawl; and should avoid concentrated exposure to extreme heat, extreme cold, vibration, and hazards. Tr. 16.

The ALJ summarized a disability report completed by the plaintiff's representative in March 2022:

> [C]onditions including blind or low vision; arthritis in her neck; torn retina; and glaucoma as physical conditions that limited the [plaintiff]'s ability to work. Her height without shoes is 5' 3", and her weight is 135 pounds. The [plaintiff] completed high school. She completed specialized job training, trade, or vocational school, as a

3

licensed esthetician. She reportedly stopped working June 26, 2017, as an administrative assistant because of her conditions (Ex. B3E [Tr. 278–86]).

Tr. 17.

The ALJ observed that in a prior decision entered in July 2019, another ALJ had found that the plaintiff had the RFC to perform light work except that she could only occasionally bend, stoop, kneel, crouch, squat, and crawl; must avoid ladders, unprotected heights, and operating heavy moving machinery; and needed good lighting in her work area. Tr. 17.

The ALJ summarized a January 2023 report by the plaintiff:

> [T]he [plaintiff] reported she does not take medication for, nor receive treatment for, a mental health issue. She lives with her boyfriend. She does not use a hand-held assistive device. She wears glasses, can read her mail but that it takes a while because the words appear to move and that it gets blurry. She can drive and see approaching traffic. Her left eye has a little bit of vision loss. Her right eye retina has been torn twice. She has issues with balance and peripheral vision. She recently hired someone to clean her place due to her inability to clean high places because of her balance problems. She sees floaters and loses balance after bending over. She takes her medication as prescribed. She keeps track of the dates and times of her own appointment (Ex. B6E [Tr. 292–93]).

Tr. 17.

The ALJ summarized a September 2023 report by the plaintiff:

> [T]he [plaintiff] reports daily activities including breakfast, laundry, making the bed, watching TV/news, cleaning up after herself, showering, dressing, taking care of plants, planning dinner. She shops for groceries twice a week. She does not need reminders for personal care, taking medicine. She prepares meals. She does household cleaning, vacuum. She hired help to clean the bathrooms and reaching high/low areas. She drives a car, goes out alone. She can manage money. She does Facetime with the grandchildren. She

4

goes to dinner with others 1-2 times a month. She apparently volunteers to feed the homeless once every 2 months at Dine With Dignity. She does not need reminders or accompaniment. She has no problems getting along with others. She has no problems with concentration, and can follow instructions. She does not identify medications or side effects (Ex. B12E [Tr. 312–19]).

Tr. 17–18.

The ALJ summarized the plaintiff's hearing testimony:

The [plaintiff] said she lives in a house, with her friend, who is age 60 years. Her friend does maintenance. She confirmed she earned a high school diploma. She also has license as customer service representative at prior employment. Her license is not current. She confirmed that she filed for Social Security retirement benefits and was awarded in 2023. In response to questions from her representative, the [plaintiff] confirmed that the primary reason she is not able to return to work is her vision. Since July 2019, her vision is worsening. Her peripheral vision is decreasing. Her balance is off. The floaters still happen. She is tripping more. She struggles more with everything, from shopping in grocery store, cooking with a recipe, reading a magazine or a book. She watches a lot of TV. She can see the TV but with glasses on a 60inch screen. The [plaintiff] said she would not be able to perform her prior work. She has a large screen desk top computer. She occasionally goes on to pay a bill. She gets a headache within 10-15 minutes. She cannot read magazines, books. The words move, she sees floaters. She has really bad headaches. Her peripheral vision has changed. It feels like a curtain on the right eye. She was told that surgery won't help. She has degenerative arthritis in her neck which causes pain. She was told she has osteoporosis. She confirmed that she is still able to drive. She only drives in places for which she is familiar. During the day, she watches a lot of TV, waters plants. She does some household cleaning. She had to hire help to clean because she cannot reach high or bend over. She goes grocery shopping with her friend. She does not use a cane or walker to help with balance. She cannot stand or sit for long periods of time. She can look at a computer screen for 10-15 minutes before getting a headache. She takes ibuprofen 800mg; it takes about an hour for her headache to recover. (Hearing Testimony [Tr. 66–88]).

Tr. 18.

5

The ALJ found that the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" Tr. 18.

The ALJ summarized notes from an eye center from 2019 to 2021:

> May 24, 2019, Eye Center of St. Augustine (Eye Center) notes reflect glaucoma check, duration 5 years. [The plaintiff] reported difficulties with depth perception, tripping a lot. She reports she drives. Vision distance with correction of 20/40 right eye, and 20/30 left eye. Intraocular pressure (IOP) 17 right, 16 left. Visual field test 30-2, stable in both eyes. The Assessment and Plan noted open angle with borderline findings, low risk, bilateral. Continue with treatment. Unspecified subjective visual disturbances, noted as expected with reduced vision of right eye, left eye function normal, cataract right eye, other vitreous opacities, bilateral. Return in one year (Ex. B7F/38–40 [Tr. 543–45]).

> July 1, 2020, Eye Center notes reflect [the plaintiff] complained of intermittent floaters, shadows over right eye, trouble doing computer work for months. She reported she drives. Findings noted vision distance with correction of 20/40+ right eye, and 20/30+ left eye, Central visual field (CVF) full to finger counting, both eyes. The Assessment was unchanged, treatment continued with prescribed oral and suspension medication (drops) (Ex. B7F/42–45 [Tr. 547–50]).

> August 3, 2020, Eye Center notes refle[c]t [the plaintiff] reported blurred vision, better. Floaters and flashes less frequent. Right eye blurry on computer and reading. Her vision without correction was 20/30 right eye, 20/40 left eye. Refraction ordered. The Assessment and Plan noted other virous opacities of right eye, stable. Return in 6-12 months (Ex. B7F/46–48 [Tr. 551–53]).

> February 12, 2021, Eye Center notes reflect right eye blurry vision since retinal tear. The Assessment and Plan noted no longer using glaucoma medication, IOP within normal limits. [The plaintiff] was recommended to use artificial tears (Ex. B7F/54–56 [Tr. 559–61]).

March 16, 2021, Eye Center Assessment and Plan noted visual field defects stable since 2019, IOP within normal limits. In this visit, Dr. Todd Hockett opined July 2020, brain MRI would not result in visual field defect of right eye (Ex. B7F/59–61 [Tr. 564–66]).

Tr. 18–19.

The ALJ summarized notes from a June 2021 primary care visit:

June 24, 2021, primary care annual well visit notes reflect [the plaintiff] has no acute concerns. She has been on long-term disability due to her retinal changes, difficulty seeing the computer, so she felt she was unable to work. Patient working with ophthalmology. Exam findings were within normal limits, except tearful when discussing stressors (Ex. B17F/14–17 [Tr. 690–93]).

Tr. 19.

The ALJ summarized a neurology evaluation completed by Bryan Riggeal, M.D., in October 2021:

October 20, 2021, neurology evaluation completed by [Dr.] Riggeal … noted visual acuity with correction was 20/40+2 right eye, and 20/20 left eye. With pinhole, visual acuity improved to 20/30+1 of right eye. CVF full to finger in both eyes except difficulty in both upper temporal quadrants. Visual Fields: Humphrey visual fields done on the Sita standard 24–2 protocol showed superior arcuate defects in both eyes with additional inferonasal depression right worse than left. MD - 12.6 left and -15.2 right. Cranial nerves intact, neurologic exam normal. The Assessment and Plan noted Right Retinal detachment, glaucoma. Dr. Riggeal noted, ["]this is a difficult situation, primarily because this is my first and only time having seen her. She clearly had a right retinal detachment in her vision is depressed, especially peripherally OD, but since her retinal detachment, even though her ophthalmologist and retina specialist have been telling her that everything retinal has been stable, she has perceived a slow, progressive loss of vision peripherally. On my visual field today, she has primarily nasal depression in both eyes, inferior thinning of the retinal nerve fiber layer["] right eye ["]with an elevated intraocular pressure["] right eye. Dr. Riggeal noted concern ["]that most of these findings point toward glaucomatous

7

> optic neuropathy, especially with the asymmetric cup-to-disc ratios, which would be a slowly progressive peripheral loss of vision, which is what she has been describing.["] Dr. Riggeal opined, ["]strictly from a neuro ophthalmic standpoint, I see no abnormalities and no evidence of a primary neurologic cause of her vision loss.["] The [plaintiff] was requested to continue to follow-up with her eye care specialist, but [Dr. Riggeal] s[aw] no evidence for further work-up or intervention from a neuro ophthalmic standpoint ([Exs.] B4F/1–4 and B5F/2–6 [Tr. 443–46, 450–54]).

Tr. 19.

The ALJ observed that the plaintiff replaced her driver's license in 2021, and the license lists a restriction of an outside mirror. Tr. 20 (citing Ex. B5F at 17–18 (Tr. 465–66)).

The ALJ summarized March and December 2022 notes from the eye center:

> March 8, 2022, Eye Center findings noted vision of right eye 20/40, left eye 20/25 (Ex. B7F/71–73 [Tr. 576–78]).
>
> December 9, 2022, Eye Center findings noted visual acuity right 20/60, left 20/40. IOP: right eye 15, left eye 18. Central visual field (CVF) full in both eyes. The Assessment and Plan noted Keratoconjunctivitis Sicca both eyes, not specified as Sjogren's. Treated with punctal plugs bilateral lower lids without complications. Primary open-angle glaucoma (POAG), indeterminate both eyes. IOP in target range. Continue current management. Nuclear sclerosis left eye- no treatment. Epiretinal membrane both eyes. Status post Vitreo-Retinal surgery right eye. Continue care with Dr. Agee. Pseudophakia status post-surgery right eye, Good post-operative appearance. Neurology consult with Dr. Reigel- no pathology discovered. Follow up in 4 months (Ex. B9F/10–12 [Tr. 595–97]).

Tr. 20.

The ALJ summarized an April 2023 consultative examination by Donald Freedman, M.D.:

> Notes reflect [that the plaintiff] drove herself to the examination. Her reported medication list noted Zyrtec, Dorzolamide, Azelastine, Ibuprofen, Multivitamin, CoQ-10, Grape seed extract, Ultimate Eye Support, Systane. Physical exam findings noted blood pressure of 170/100, height 63", weight 145 pounds, pulse rate 99. Her corrected visual acuity of right eye 20/50, left eye 20/30, and 20/25 both eyes. Normal exam of eyes, ears nose, and throat, neck, heart, lungs, abdomen, extremity, joints, skin, neurological. Findings noted 5/5 musculoskeletal strength, normal deep tendon reflexes, normal sensory and normal range of motion in upper and lower extremities. Grip strength was 5/5 bilaterally. Intact fine and gross dexterity bilaterally. Spine was straight with no bony deformity. No tenderness reported during palpation. Cervical spine forward flexion normal, slightly decreased remaining range of motion of cervical spine. Ranges of motion normal as to lumbar spine and throughout all areas. Paravertebral spasm identified. Seated and supine straight leg raise was negative. The [plaintiff] reported nausea and floaters with lying supine. Intact cranial nerves. Normal gait, stance, station, transferring, etc. Negative Romberg. Squat 50%. She had a steady gait wearing medium height heels. She was able to tandem gait. No hand-held assistive device used (Ex. B10F [Tr. 598–605]).

Tr. 20.

The ALJ summarized an April 2023 consultative vision exam by Dr. Daniel Miles:

> An April 5, 2023, consultative vision exam completed by ophthalmologist, [Dr.] Miles, noted the [plaintiff]'s visual acuity with old prescription was 20/80 right eye and 20/40 left eye. Visual field Testing by Humphrey's: right eye MD -18.83; left eye MD -12.85. She was recommended to continue eye care at Eye Center. She had an appointment with Dr. Hockett in one week (Ex. B11F [Tr. 606–09]).

Tr. 20.

9

The ALJ summarized May 2023 notes from the eye center:

> May 8, 2023, Eye Center of St. Augustine findings noted visual acuity Dcc right eye 20/60, left eye 20/40. IOP right eye 15. Left eye 18. CVF full right eye and left eye. The Impression/Plan noted POAG, Indeterminate right eye. The IOP in the target range. Current management continued. Keratoconjunctivitis Sicca, not specified as Sjogren's both eyes. Placed punctal plugs. Recommended-artificial tears to use as directed. Nuclear-Sclerosis left eye. No treatment. Cataract(s) account for the [plaintiff's] complaint. [Plaintiff] will continue to monitor vision changes and contact our office with any decrease in vision. No treatment is currently recommended. Epiretinal Membrane both eyes. Status post Vitro-Retinal Surgery right eye (RD Repair x2). Continue care with Dr. Agee. Pseudophakia status post YAG OD. Good post-operative[ ]appearance (Ex. B12F/4– 6 [Tr. 613–15]).

Tr. 20–21.

The ALJ summarized September 2023 ophthalmologic exam findings by Dr. Hockett:

> September 12, 2023, ophthalmologic exam findings from [Dr.] Hockett, OD, Eye Center noted visual acuity of 20/60 right eye, and 20/30 left eye. Findings noted no significant change from prior study. Loss of Retinal nerve fiber layer (RNFL) inferiorly and superiorly. Findings of left eye, guide treatment, normal RNFL. The Impression/Plan were unchanged from the prior visit (Ex. B15F [Tr. 668–72]).

Tr. 21.

The ALJ summarized March 2024 notes from Southeastern Retina Specialists:

> March 4, 2024, Southeastern Retina Specialists notes reflect follow-up. [The plaintiff] compl[ained] of blurry vision, both eyes, worsening. Systemic medications noted vitamins only, ibuprofen as needed, Zyrtec. Visual acuity of right eye, Dcc 20//50-2, left eye Dcc 20/25. IOP 24 right, 28 left. OCT macula findings noted trace retinal

> thickening consistent with macula edema of right eye. Vitreous separation consistent with a posterior vitreous detachment. Preretinal findings consistent with an epiretinal membrane. No evidence of subretinal fluid in either eye. The Plan noted observation for both eyes (Ex. B16F/2–4 [Tr. 674–76]).

Tr. 21.

The ALJ observed that "[t]here are no additional treatment notes or objective findings beyond" March 2024. Tr. 21.

The ALJ found that the plaintiff's "statements about the intensity, persistence, and limiting effects of her symptoms … are inconsistent because they are not fully supported by the objective evidence and treatment notes." Tr. 21. The ALJ provided this explanation:

> [The plaintiff] has a history of retina detachment and surgery on her right eye. She is noted for low vision and lattice degeneration of retina. She has variably complained of blurry vision of right eye, floaters, difficulty with depth perception. The longitudinal record indicates regular/routine testing and monitoring by ophthalmologic specialists. Treatment has consisted of prescribed glasses; eye drops and medication. The [plaintiff] maintains the ability to drive a car and go out alone. She is able to independently engage in activities of daily living including personal care, cooking, shopping, cleaning, and laundry. Although she reports having hired cleaning assistance, she is still able to perform these tasks within reported limitations.

Tr. 21.

The ALJ summarized an April 2023 opinion by Dr. Freedman:

> The undersigned fully considered the medical opinions and prior administrative medical findings including the April 4, 2023, opinion from Donald S. Freedman, M.D., who conducted a consultative exam. The diagnostic impressions note history of hypertension untreated, history of retinal detachment times 2 right eye, history of loss of peripheral vision and blurry vision right eye, history of cataracts both eyes status post repair, history of glaucoma both eyes, history

11

of vertigo, history of cervicalgia (Ex. B10F [Tr. 598–605]). Although Dr. Freedman did not assess work-related limitations, he reported a physical examination report noting decreased cervical spine range of motion, 50% squatting ability, and paravertebral spasm identified, but otherwise within normal limits throughout, including 5/5 extremity strength, normal gait, no assistive device, and steady gait while wearing heels. These findings do not preclude an ability to engage in a range of light exertion work with postural and environmental limitations as assessed herein.

Tr. 21–22.

The ALJ addressed a June 2023 evaluation by Sharmishtha Desai, M.D.:

On June 20, 2023, at the initial level, medical consultant Sharmishtha Desai, M.D., evaluated the [plaintiff]'s severe impairments of Osteoarthrosis and Allied Disorders; Migraine; and Visual Disturbances, finding she had the Physical … [RFC] to perform work at the Medium exertion level, with the ability [to] lift and/or carry 50 pounds occasionally, and 25 pounds frequently. She could sit, stand and/or walk about 6 hours in an 8-hour workday. Postural limitations including frequent climbing of ramps and stairs, occasional climbing of ladders, ropes, or scaffolds, frequent stooping, and frequent crawling. Environmental limitations were to avoid concentrated exposure to extreme cold, extreme hot, vibration, and hazards, including machinery, heights, etc. (Ex. B4A/4–8 [Tr. 114–18]).

Tr. 22.

The ALJ observed that "[o]n April 20, 2023, psychological consultant, Judith E. Meyers, Psy.D., determined there are no mental medically determinable impairments established (Ex. B4A/3–4 [Tr. 113–14])." Tr. 22.

The ALJ summarized an October 2023 opinion of Andrew Scanameo, M.D.:

On October 4, 2023, medical consultant, Andrew Scanameo, M.D. similarly evaluated the [plaintiff]'s severe impairments of Osteoarthrosis and Allied Disorders; Migraine; and Visual

> Disturbances, finding she had the Physical … [RFC] to perform work at the Light exertion level, with the ability [to] lift and/or carry 20 pounds occasionally, and 10 pounds frequently. She could sit, stand and/or walk about 6 hours in an 8-hour workday. Postural and environmental limitations were unchanged from the initial assessment, including frequent climbing of ramps and stairs, occasional climbing of ladders, ropes, or scaffolds, frequent stooping, frequent crawling; and to avoid concentrated exposure to extreme cold, extreme hot, vibration, and hazards, including machinery, heights, etc. Dr. Scanameo concluded, based on totality of evidence[]. Hypertension not treated, yet no current evidence of any significant end organ disease. Dr. Scanameo opined no medically determinable impairments for [the plaintiff]'s reported pain in neck, back, shoulders, and headache in Pain Questionnaire (at Ex. B4E [Tr. 287–89]). No specific treatment for such except [the plaintiff] reported taking Ibuprofen. Most recent consultative exam on April 4, 2023 (at Ex. B10F [Tr. 598–605]) reported essentially normal exams of shoulders, full range of motion of lumbar spine, negative bilateral straight leg raise tests, slightly limited range of motion of cervical spine; normal neurologic and musculoskeletal exam of bilateral upper and lower extremities, normal gait and ambulatory tasks, no assistive device used. No emergency department visits for such. Dr. Scanameo noted cervical spine x-rays and MRI in file. Dr. Scanameo concluded, therefore, no indication for obtaining current x-rays of lumbar spine, cervical spine, or shoulders; or any additional development for headache; as any of this additional development or x-rays not going to make any significant impact on the assessment, and to avoid unnecessary risk of radiation exposure. Dr. Scanameo referred to DI 34001.010, opining no current evidence of blind behavior. No listing level impairment, no current evidence of profound functional loss (Ex. B6A/4–8 [Tr. 114–18]).

Tr. 22.

The ALJ observed that "[o]n October 4, 2023, psychological consultant, Michelle Butler, Psy.D., likewise concluded there are no mental medically determinable impairments established (Ex. B6A/3–4 [Tr. 123–24])." Tr. 22.

13

The ALJ explained the persuasiveness of the medical opinions and prior state agency findings:

> The Disability Determination Services [(DDS)] Initial and Reconsideration determinations are in evidence. There was no objection to admitting these determinations into evidence; no argument was made regarding the persuasive weight, or lack thereof, to be accorded to these non-examining experts' opinions. As these opinions are therefore uncontested, they are persuasive to the extent they are supported by and consistent with the totality of the competent evidence of record. All medical evidence submitted pre-reconsideration was considered within or is consistent with DDS Evaluations. The opinions of certain non-examining medical and psychological consultants are persuasive through the date of Reconsideration issuance (October 2023 at Ex. B6A [Tr. 121–30]). Notably, Dr. Desai's assessment of medium exertion at the initial level is not persuasive, given the [plaintiff]'s history of cervicalgia and low vision.
>
> While the overall evidence does not support a finding that Migraines and Osteoarthrosis are severe impairments and not persuasive, the postural and environmental limitations as assessed by Drs[.] Desai and Scanameo have persuasiveness as supported by the record evidence noting degenerative disc disease, headache disorders, and low vision. The opinions from Drs. Meyers and Butler are persuasive. The [plaintiff] did not allege a mental impairment and did not testify to functional limitations as a result of a mental health condition. Further, [the plaintiff] reports independence in daily activities and functioning which support this conclusion. The medical and psychological consultants offer a thorough and comprehensive assessment of the evidence. Their opinions are consistent with and supported by competent evidence of record. Based on the foregoing, the undersigned finds the [plaintiff] has the above [RFC] assessment, which is supported by the totality of evidence in the record.

Tr. 22–23 (internal citations omitted).

Relying on the testimony of a vocational expert (VE), the ALJ found that the plaintiff could have performed her past relevant work as an administrative assistant (as generally and actually performed) during the relevant time period. Tr. 23. The ALJ observed that the VE "further testified that the

[plaintiff] could [have] still perform[ed] her past work as actually and generally performed if limited to light exertion, with occasional bending, stooping, kneeling, crouching, squatting, and crawling; avoiding ladders, unprotected heights, the operation of heavy moving machinery; and needing good lighting in her work area." Tr. 23; *see* Tr. 83. The ALJ observed that the Dictionary of Occupational Titles (DOT) does not address lighting. Tr. 23; *see* Tr. 83. The ALJ observed that the VE "also testified as to employer tolerance for off-task behavior, absenteeism, sit/stand option as well as job duties/demands related to visual acuity and computer use." Tr. 23; *see* Tr. 83–86. The ALJ found that "[t]he [VE]'s testimony was supplemented by her professional training, education, and experience." Tr. 23. The ALJ summarized the VE's testimony in responding to a hypothetical posed by the plaintiff's representative:

> In response to a proposed hypothetical from the [plaintiff]'s representative, in which the claimant was limited as in hypothetical one but could not work on a computer screen for more than 10 minutes and needing to be off the computer for one hour, the [VE] identified light exertion jobs that exist in significant numbers in the national economy, including Housekeeping Cleaner, DOT# 323.687-014, light, SVP 2, with 177,000 jobs in the national economy; Cafeteria Attendant, DOT# 311.677-010, light, SVP 2, with 25,000 jobs in the national economy; and Marker, DOT# 209.587-034, light, SVP 2, with 136,000 jobs in the national economy.

Tr. 24; *see* Tr. 84–85. The ALJ accepted the VE's testimony "as accurate and reliable evidence." Tr. 24 (citing Hearing Testimony (Tr. 66–88)).

The ALJ thus found that the plaintiff was not disabled during the relevant time period. Tr. 24.

15

**3.**

A claimant's RFC is the most the claimant can still do despite her limitations. 20 C.F.R. § 404.1545(a)(1). The Social Security Administration (SSA) will assess the RFC "based on all of the relevant medical and other evidence." *Id.* § 404.1545(a)(3). In determining the RFC, the SSA "will consider the limiting effects of all … impairment(s), even those that are not severe." *Id.* § 404.1545(e).

An ALJ must consider a claimant's symptoms and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence. *Id.* § 404.1529(a). Factors for consideration include:

> (i)    [the claimant's] daily activities;
>
> (ii)   [t]he location, duration, frequency, and intensity of … pain or other symptoms;
>
> (iii)  [p]recipitating and aggravating factors;
>
> (iv)   [t]he type, dosage, effectiveness, and side effects of any medication [that the claimant] take[s] or ha[s] taken to alleviate … pain or other symptoms;
>
> (v)    [t]reatment, other than medication, [that the claimant] receive[s] or ha[s] received for relief of … pain or other symptoms; [and]
>
> (vi)   [a]ny measures [the claimant] use[s] or ha[s] used to relieve … pain or other symptoms[.]

*Id.* § 404.1529(c)(3)(i)–(vi). An ALJ will consider the claimant's "statements about the intensity, persistence, and limiting effects of … symptoms" and evaluate the statements "in relation to the objective medical evidence and other evidence." *Id.* § 404.1529(c)(4). An ALJ "will consider whether there are

16

any inconsistencies in the evidence and the extent to which there are any conflicts" between the claimant's statements and the other evidence. *Id.*

Symptoms alone cannot establish the presence of functional limitations; they must be found to be consistent with the objective and other evidence of record. *See Edwards v. Sullivan*, 937 F.2d 580, 584 (11th Cir. 1991); 20 C.F.R. § 404.1529(a) ("[S]tatements about [a claimant's] pain or other symptoms will not alone establish that [the claimant is] disabled.").

### 4.

The plaintiff argues that the ALJ reversibly erred by considering her activities to reject her statements about the intensity, persistence, and limiting effects of her symptoms. Doc. 10 at 10–12. The plaintiff relies on the regulation pertaining to "substantial gainful activity" that explains, "Generally, we do not consider activities like taking care of yourself, household tasks, hobbies, therapy, school attendance, club activities, or social programs to be substantial gainful activity." *See* Doc. 10 at 11 (citing 20 C.F.R. § 404.1572(c) (quoted)). The plaintiff complains about the "breathtakingly minimal conclusory nature of this critical finding." Doc. 10 at 12. "In short," the plaintiff contends, "the ALJ's findings are not supported by substantial evidence, i.e., not logically bridged to the record before him." Doc. 10 at 14.

The Commissioner disagrees. Doc. 16 at 5–13. The Commissioner contends that substantial evidence thoroughly discussed by the ALJ supports the RFC, and the prior administrative medical findings provide further support for the RFC. Doc. 16 at 6–9. "In short," the Commissioner contends, "[the p]laintiff failed to show that her impairments resulted in any limitation in excess of any limitation already assessed in the RFC." Doc. 16 at 10. The

Commissioner further contends that substantial evidence supports the ALJ's finding that the plaintiff's statements about the limiting effects of her symptoms were not entirely consistent with the evidence. Doc. 16 at 11.

The plaintiff replies to the Commissioner's use of "debilitating" in the first sentence of the response. Doc. 17 at 2–4; *see* Doc. 16 at 1 ("Though Plaintiff claimed that her impairments were debilitating, the [ALJ] reviewed the medical evidence and found that Plaintiff was not disabled."). She contends that "she does not need to prove 'debility' to receive benefits, or even all that much of a vision impairment for that matter, because there are no vision findings from the ALJ to consider." Doc. 17 at 2. She continues, "And, the fact that vision impairments are 'nonexertional' impairments which require input by a [VE] makes the ALJ's failure to include or explain exclusion harmful error." Doc. 17 at 2. She further contends that the Commissioner's response amounts to "post hoc rationalizations of how the record purportedly supported the ALJ's exclusion of vision limits from the RFC—not a showing of how the ALJ explicitly considered them." Doc. 17 at 4.

**5.**

The ALJ included at least one limitation in the RFC to account for the plaintiff's vision problems. *See* Tr. 16 (avoid concentrated exposure to hazards). Contrary to the plaintiff's arguments, the ALJ complied with the regulations and properly considered the plaintiff's statements about her symptoms and the relevant factors in relation to the objective medical evidence and other evidence. *See* Tr. 21. The ALJ accounted for the plaintiff's vision problems and included limitations he found supported by the record. Substantial evidence, described in the ALJ's decision and as follows, supports the RFC and the ALJ's finding about the plaintiff's statements.

The plaintiff does not use a hand-held assistive device. Tr. 17 (citing Exhibit B6E (Tr. 292–93)). She wears glasses to correct her vision. Tr. 17 (citing Exhibit B6E (Tr. 292–93)). She can drive and see approaching traffic. Tr. 17 (citing Exhibit B6E (Tr. 292–93)). She plans and prepares meals, does the laundry, makes the bed, cleans up after herself, dresses, showers, takes care of her plants, shops for groceries twice a week, takes medicine, drives, goes out alone, goes out to dinner with others once or twice a month, volunteers to help the homeless once every two months, and can concentrate. Tr. 17–18 (citing Exhibit B12E (Tr. 312–19)). She watches a lot of television and Facetimes with her grandchildren. Tr. 17–18 (citing Exhibit B12E and Hearing Testimony (Tr. 66–88, 312–19)). She takes her medications as prescribed and has identified no side effects. Tr. 17–18 (citing Exhibits B6E, B12E (Tr. 292–93, 312–19)). Treatment at the eye center consisted of prescription glasses, artificial tears, and medication. Tr. 19 (citing Exhibit B7F (Tr. 506–80)). The only restriction on the plaintiff's driver's license, renewed in 2021, was an outside mirror. Tr. 20 (citing Exhibit B5F at 17–18 (Tr. 465–66)). The plaintiff reported no acute concerns at her June 2021 primary care visit. Tr. 19 (citing Exhibit B17F at 14–17 (Tr. 690–93)). Dr. Riggeal observed that the plaintiff's "ophthalmologist and retina specialist have been telling her that everything retinal has been stable[.]" Tr. 19 (citing Exhibit B5F at 5 (Tr. 453)). He saw no abnormalities and no evidence of a primary neurologic cause of her vision loss and "no evidence for further work-up or intervention from a neuro ophthalmic standpoint." Tr. 19 (citing Exhibit B5F at 5 (Tr. 453)). The December 2022 notes from the eye center showed a good post-operative appearance. Tr. 20 (citing Exhibit B9F at 10–12 (Tr. 595–97)). The April 2023 consultative examination noted normal eye exam findings, that the plaintiff reported nausea and floaters *when lying supine*, and that she had a steady gait with

19

medium-height heels. Tr. 20 (emphasis added) (citing Exhibit B10F (Tr. 598–605)). No treatment was recommended from the eye center in May 2023, and a good post-operative appearance was noted. Tr. 20–21 (citing Exhibit B12F at 4–6 (Tr. 613–15)). The March 2024 notes from the retina specialists reflected only a plan to observe both eyes and take medication as needed. Tr. 21 (citing Exhibit B16F at 2–4 (Tr. 674–75)). No doctor opined that the plaintiff needs a limitation that the ALJ excluded from the RFC. *See* Tr. 18–23. Dr. Freedman assessed no work-related limitations. Tr. 21 (citing Exhibit B10F (Tr. 598–605)). Dr. Desai opined that the plaintiff has an RFC less limited than the RFC the ALJ found. Tr. 22 (citing Exhibit B4A at 4–8 (Tr. 114–18)). Specifically, Dr. Desai opined that the plaintiff could perform medium work, but the ALJ found the assessment unpersuasive "given the [plaintiff]'s history of cervicalgia and low vision." Tr. 23. Dr. Scanameo did not find any limitations beyond the RFC and found no evidence of "blind behavior" and "no current evidence of profound functional loss." Tr. 22 (citing Exhibit B6A at 4–8 (Tr. 124–28)).

The plaintiff contends that because vision impairments are nonexertional and require input from a VE, "the ALJ's failure to include or explain exclusion [is] harmful error." Doc. 17 at 2. She states, "[I]f low vision-related limitations were considered and the VE testified that these limitations prevented her from performing her job as an administrative assistant, she is 'disabled' by operation of SSA's grid rules based on the ALJ's own findings." Doc. 17 at 3 (citing 20 C.F.R. Part 404, Subpt. P, App'x 2, § 202.02). She continues, "[T]he inclusion of *any* vision limitation, *no matter how minimal*, would have obligated the ALJ to inquire with a VE about the erosive effect of that 'nonexertional' impairment." Doc. 17 at 3–4 (emphases in original). The plaintiff shows no reversible error. She fails to describe any specific vision-related limitation that the ALJ should have included in the

20

RFC. Moreover, the ALJ presented to the VE a hypothetical with a more restrictive RFC, including "occasional bending, stooping, kneeling, crouching, squatting, and crawling; avoiding ladders, unprotected heights, the operation of heavy moving machinery; and needing good lighting in [the] work area," and the VE testified that the plaintiff's past relevant work would have remained suitable under the hypothetical. Tr. 23; *see* Tr. 83.

Remand is unwarranted.

### 6.

The Commissioner's decision is **affirmed**. The clerk is **directed** to enter judgment in favor of the Commissioner of Social Security and against Debra Palopoli and close the file.

**Ordered** in Jacksonville, Florida, on May 29, 2026.

Patricia D. Barksdale
United States Magistrate Judge

21